# THE STATE OF NEW HAMPSHIRE

# SUPREME COURT

**In Case No. 2022-0372, <u>State of New Hampshire v. Vincent Cooper</u>, the court on September 12, 2023, issued the following order:**

The court has reviewed the written arguments and the record submitted on appeal, has considered the oral arguments of the parties, and has determined to resolve the case by way of this order. <u>See</u> <u>Sup. Ct. R.</u> 20(2). The defendant, Vincent Cooper, appeals his conviction following a jury trial in Superior Court (<u>St. Hilaire</u>, J.), on one felony count of second degree assault-domestic violence, in that he knowingly engaged in the strangulation of another. <u>See</u> RSA 631:2, I(f) (2016); RSA 631:2, III (Supp. 2022). The defendant argues that the trial court erred when it ruled that he "opened the door" to the admission of text messages that he sent to the victim about obedience and respect. The State counters that even if the trial court erred in allowing the State to read aloud the messages during its cross-examination of the defendant, any error was harmless beyond a reasonable doubt. We affirm.

I

The jury could have found the following facts. The defendant and the victim met in January 2019 and married approximately one week later. After marrying, their relationship went downhill "fairly quickly." The victim testified that there was "a lot of" physical, mental, and emotional abuse in the relationship "from the very beginning." In February 2019, the victim became pregnant and gave birth to twins in October. In the weeks that followed, the victim was home alone with the children during the day when the defendant was at work.

On December 18, 2019, the defendant, after arriving home from work, spent approximately four hours on the phone. The victim and the children were in the bedroom and the victim yelled for the defendant, who was in an adjacent room, to get something for the children that she needed. The defendant muted his phone and yelled at the victim that she was interrupting his phone call and "should know better." The victim, who had her phone in her hand, walked to where she could see the defendant, asked for help again, and made a comment about his phone call. The victim testified that, because there had been prior acts of violence and abuse, she knew from the look on the defendant's face that "he was going to physically do something." She told the defendant that she "was going to record him beating his wife" and started recording on her phone.

The defendant struck the phone out of her hand and it flew across the bedroom and landed against the wall by the bed. The defendant then struck the victim in the face, grabbed her and threw her down on the bed, with one hand choking her throat and the other hand over her mouth. The victim testified that she was scared and could not breathe. The defendant, while still holding the victim's neck, grabbed a pillow and put it over her face, applying pressure to push the pillow into her face. The victim testified that, despite attempting to, she could not breathe, was fighting to stay alive, felt like she was going to die, and was in "excruciating" pain because her neck had cracked.

II

After the defendant's direct examination, the State asked to cross-examine the defendant about text messages between the defendant and the victim regarding respect in the relationship, arguing that the messages were relevant to show the defendant's mental state during the assault and that they established a motive for the defendant's emotional and physical abuse of the victim. Over defense counsel's objection, the trial court ruled that, because the defendant testified and claimed self-defense as his motive for assaulting the victim, he had put at issue "who would be the primary aggressor and who started this" and, therefore, it was "appropriate for the State to explore that area." The State then read aloud several text messages in which the defendant texted the victim that: (1) when he says something, the victim is "going to respect it"; (2) the victim had "been disrespectful to [him] for years"; (3) the victim had disrespected him in front of another person; and (4) the rules for his relationship with the victim included "being completely faithful and loyal" and that "[d]isrespectful is not to be tolerated, and it's a mandatory violation." We need not determine whether the trial court erred because we conclude that the asserted error would be harmless.

To establish harmless error, the State must prove beyond a reasonable doubt that the error did not affect the verdict. State v. Boudreau, 176 N.H. ___, ___ (decided June 7, 2023) (slip op. at 9). This standard applies to both the erroneous admission and exclusion of evidence. Id. We consider the alternative evidence presented at trial as well as the character of the erroneously admitted evidence itself. Id. To determine whether the State has proven beyond a reasonable doubt that an error did not affect the verdict, we must evaluate the totality of the circumstances at trial. Id.

The factors that we have considered in assessing whether an error did not affect the verdict include, but are not limited to: (1) the strength of the State's case; (2) whether the admitted or excluded evidence is cumulative or inconsequential in relation to the strength of the State's case; (3) the frequency of the error; (4) the presence or absence of evidence corroborating or contradicting the erroneously admitted or excluded evidence; (5) the nature of the defense; (6) the circumstances in which the evidence was introduced at

2

trial; (7) whether the court took any curative steps; (8) whether the evidence is of an inflammatory nature; and (9) whether the other evidence of the defendant's guilt is of an overwhelming nature. Id. at ___ (slip op. at 10). No one factor is dispositive, we may consider factors not listed above, and not all factors may be implicated in a given case. Id.

The defendant was charged with knowingly engaging in the strangulation of the victim in that he used his hand to apply pressure to her neck or throat and/or covered her face with a pillow causing her to experience impeded breathing or a change in voice. See RSA 631:2, I(f); RSA 631:2, II(c) (2016) (defining "strangulation" as "the application of pressure to another person's throat or neck, or the blocking of the person's nose or mouth that causes the person to experience impeded breathing or blood circulation or a change in voice").

As set forth above, the evidence of the defendant's guilt was overwhelming. The victim testified that the defendant threw her on the bed, choked her with one hand and applied pressure to push a pillow into her face with the other hand, thereby impeding her breathing. The defendant admitted on cross-examination that he "slammed [the victim] onto the mattress," "got on top of her," put his hand on the side of her face, and "mushed her head into the mattress." The defendant testified that he released pressure from the victim "[b]ecause she was struggling" and "said she couldn't breathe" and that, hearing her neck crack, he "got up off her." The defendant admitted that the eight-minute video recording from the victim's phone, which was played for the jury, recorded the victim's voice, the change in her voice, and her struggle to breathe.

Furthermore, the text messages were inconsequential in relation to the strength of the other evidence that the defendant strangled the victim. Therefore, we conclude that, based upon the totality of the circumstances, even if the trial court erred in allowing the State to read aloud the text messages during its cross-examination of the defendant, any error did not affect the verdict and thus was harmless beyond a reasonable doubt.

Affirmed.

MACDONALD, C.J., and HICKS, BASSETT, HANTZ MARCONI, and DONOVAN, JJ., concurred.

**Timothy A. Gudas,
Clerk**

3